MARC M. SELTZER (054534)
mseltzer@susmangodfrey.com
STEVEN G. SKLAVER (237612)
ssklaver@susmangodfrey.com
KALPANA SRINIVASAN (237460)
ksrinivasan@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, California  90067-6029
Telephone:  (310) 789-3100
Fax:  (310) 789-3150

LESTER L. LEVY (PHV to be filed)
llevy@wolfpopper.com
WOLF POPPER LLP
845 Third Avenue
New York, NY 10022
Telephone: (212) 759-4600
Fax: (212) 486-2093

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| LIANNE LAREINE, MARGUERITE CHANDLER, JAMES EVANS, BONITA LAGOE, LEA JORDANIDES and YVONNE E. RODRIGUEZ, individually and as class representatives on behalf of all others similarly situated, | Case No. |
| | |
| Plaintiffs, | **CLASS ACTION** |
| | **CLASS ACTION COMPLAINT DAMAGES AND INJUNCTIVE RELIEF** |
| vs. | |
| GENERAL MOTORS LLC, and DELPHI AUTOMOTIVE PLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

1

## TABLE OF CONTENTS

2   I.     INTRODUCTION .................................................................................... 1

3   II.    JURISDICTION AND VENUE ............................................................... 6

    III.   PARTIES ................................................................................................. 7

4   IV.    DEFENDANTS' WRONGFUL COURSE OF CONDUCT ...................... 10

5          A.     The Ignition Switch Defects in the Subject Vehicles ...................... 10

6          B.     GM Knew of the Ignition Switch Defects for Years, but
                  Concealed the Defects from Plaintiffs and the Class........................ 11

7          C.     Old GM Promoted the Subject Vehicles as Safe and Reliable........... 21

           D.     The Ignition Switch Defects Have Harmed Plaintiffs and the
8                 Class .................................................................................................. 22

9   V.     SUCCESSOR LIABILITY ...................................................................... 23

10  VI.    TOLLING OF THE STATUTES OF LIMITATION ................................ 24

    VII.   CLASS ALLEGATIONS ......................................................................... 24

11  VIII.  CLAIMS FOR RELIEF ........................................................................... 29

12         FIRST CLAIM FOR RELIEF.................................................................. 29

13         SECOND CLAIM FOR RELIEF............................................................. 30

           THIRD CLAIM FOR RELIEF ................................................................ 32

14         FOURTH CLAIM FOR RELIEF............................................................. 33

15         FIFTH CLAIM FOR RELIEF.................................................................. 36

16         SIXTH CLAIM FOR RELIEF................................................................. 38

           SEVENTH CLAIM FOR RELIEF........................................................... 39

17         EIGHTH CLAIM FOR RELIEF.............................................................. 40

18         NINTH CLAIM FOR RELIEF................................................................. 43

19         TENTH CLAIM FOR RELIEF................................................................. 44

    IX.    PRAYER FOR RELIEF........................................................................... 47

20         JURY TRIAL DEMAND......................................................................... 49

21

22

23

24

25

26

27

28

1       Plaintiffs Lianne LaReine, Marguerite Chandler, James Evans, Lea

2   Jordanides, Bonita LaGoe and Yvonne E. Rodriguez, individually and as class

3   representatives on behalf of all others similarly situated, brings this action against

4   Defendant General Motors LLC ("GM" or "the Company") and Delphi Automotive

5   PLC ("Delphi") (collectively, "Defendants"), and alleges as follows:

6   I.    **INTRODUCTION**

7       1.      GM has sold more than 2 million vehicles that have a serious safety

8   defect.   Millions of GM vehicles have defective "ignition switch torque

9   performance," which means the vehicle's ignition switch may move out of the

10  "run" position, turning off the engine and most of the electrical components on the

11  vehicle and causing air bags not to deploy depending on the time that the ignition

12  moved out of the "run" position.

13      2.      GM has now admitted that this safety defect is the cause of at least 13

14  deaths and numerous accidents over the past decade.  According to a memorandum

15  released by Congress, a 2001 pre-production report for the MY 2003 Saturn Ion

16  identified issues with the ignition switch.   In a section entitled "Root Cause

17  Summary," the report stated that the "two causes of failure" were "[l]ow contact

18  force and low detent plunger force."   The report stated that a design change

19  resolved the problem.

20      3.      In 2005, GM discussed two separate fixes for the ignition switch

21  defect but canceled both of them without taking action.  According to the memo,

22  GM engineers met in February 2005 to consider making changes to the ignition

23  switch defect after receiving reports it was moving out of position and causing cars

24  to stall.   But an engineer said the switch was "very fragile" and advised against

25  changes.  In March 2005, the GM engineering manager of the Chevrolet Cobalt

26  closed the case, saying an ignition switch fix would take too long and cost too

27  much, and that "none of the solutions represents an acceptable business case."  In

28  May 2005, the Company's brand quality division requested a new investigation into

3136095v1/014242

1  ignitions turning off while driving, and a new review suggested changing the design
2  of the key so it would not drag down the ignition.   That proposal was initially
3  approved but later cancelled.

4          4.      In May 2009, GM engineers again concluded that millions of cars that
5  GM sold had this serious safety defect.  In the months and years that followed, as
6  the internal documents and studies increasingly confirmed the safety problems, GM
7  hid that information, but finally publicly disclosed the existence of those safety
8  problems in February 2014.

9          5.      GM began installing these ignition switch systems in models from
10 2002 through at least 2010.  GM promised that these new systems would operate
11 safely and reliably.  This promise turned out to be false in several material respects.
12 In reality, GM concealed a serious quality and safety problem in those vehicles,
13 which could have been avoided.

14         6.      From early 2000 to the present, GM has received a variety of reports
15 that put GM on notice of the serious safety issues presented by its ignition switch
16 system.   Despite notice of the defect in its vehicles, GM did not disclose to
17 consumers that its vehicles – which GM for years had advertised as "safe" and
18 "reliable" – were in fact not safe or reliable.

19         7.      GM approved the defective ignition switch for use in these vehicles in
20 February 2002 despite being presented with testing results showing that it
21 repeatedly failed to meet the company's specifications, according to a letter sent to
22 GM on March 31, 2014 by a congressional committee.  The switch was redesigned
23 in 2006 for use in 2007 and later model year cars were also approved by GM
24 despite again not meeting company specifications.

25         8.      GM's CEO, Mary Barra recently admitted that:  "Something went
26 wrong with our process in this instance, and terrible things happened."

27         9.      In her written opening remarks before Congress on April 1, 2014, Ms.
28 Barra further acknowledged GM's delay: "Sitting here today, I cannot tell you why

1   it took years for a safety defect to be announced in that program, but I can tell you

2   that we will find out."

3          10.     This case arises from GM's breach of its obligations and duties,

4   including GM's failure to disclose that, as a result of defective ignition switch

5   design, at least 2.2 million GM vehicles had the propensity to shut down during

6   normal driving conditions and created an extreme and unreasonable risk of

7   accident, serious bodily harm, and death which made the vehicles less valuable at

8   the time of purchase.

9          11.     GM's predecessor, General Motors Corporation ("Old GM") also

10  violated these rules by designing and marketing vehicles with defective ignition

11  switches, and then by failing to disclose that defect even after it became aware that

12  the ignition switch defect was causing fatal accidents.  (GM and Old GM are

13  sometimes referred to herein as "the GM Companies.")  In addition to the liability

14  arising out of the statutory obligations assumed by GM, GM also has successor

15  liability for the deceptive and unfair acts and omissions of Old GM because GM

16  has continued the business enterprise of Old GM with full knowledge of the

17  ignition switch defects.

18         12.     The defective ignition switches were manufactured by Delphi

19  Automotive PLC ("Delphi").  Once a subsidiary of Old GM, Delphi was spun-off

20  from Old GM in 1999, and was an independent publicly-held corporation.  Delphi

21  and the GM Companies are referred to herein collectively as "Defendants."

22         13.     Delphi officials have admitted to Congress that it was "well

23  documented" in 2002 that testing results showed the ignition switch was far below

24  GM's specifications.  According to Delphi officials, GM began discussions with

25  Delphi about the need to modify and re-test the switch in mid-2005 but the results

26  again revealed the switches still did not meet GM's documented specifications.

27

28

14.   Delphi officials have confirmed to Congress that these testing results mean the ignition switches currently in use in 2008-2011 vehicles also do not meet GM performance specifications.

15.   In a letter dated April 15, 2014, members of the Senate Commerce Committee quizzed Delphi about its role and knowledge in the defective ignition switches.  "As we continue evaluating the GM recall, it is critically important that we understand the decisions made by Delphi and the company's interaction with GM.   In your response to these questions, please provide all corresponding documentation that will assist us in determining what Delphi knew and the actions taken place to replace the faulty ignition switches it provided to GM."

16.   Plaintiffs allege, based on information and belief, that Delphi knew its ignition switches were defective, but nevertheless continued to manufacture and sell the defective ignition switch systems, which it knew would be used in the vehicles of Plaintiffs and the Class.

17.   Plaintiffs bring this action for a Class of all persons in the United States who currently own or lease one or more of the following GM vehicles: 2005-2010 Chevrolet Cobalts; 2006-2010 Pontiac Solstices; 2007-2010 Pontiac G5s; 2007-2010 Saturn Skys; 2006-2011 Chevrolet HHRs; and 2003-2007 Saturn Ions (hereinafter the "Subject Vehicles").

18.   Plaintiffs believe that there are other GM vehicles which suffer from the same or substantially similar ignition switch defects as the Subject Vehicles identified above.   Accordingly, Plaintiffs will supplement the list of Subject Vehicles to include additional GM vehicles that have defective ignition switches, which result in a loss of engine and electrical power, loss of vehicle speed control, loss of braking control, and airbag non-deployment.

19.   Plaintiffs also sue for a subclass of California, Oklahoma, South Carolina, Colorado and Florida, residents who own or lease one or more Subject Vehicles.

3136095v1/014242

20.     The Subject Vehicles are defective and dangerous for multiple reasons, including the following (collectively, the "ignition switch defects"):

      a.     The ignition switches can inadvertently shut off the engine and vehicle electrical system during normal driving conditions;

      b.     When the engine and the electrical system shut down, the power steering and power brakes also shut down, creating a serious risk of accident;

      c.     When the electrical system shuts down, the vehicle's airbags are disabled, creating a serious risk of serious bodily harm or death if an accident occurs.

21.     The ignition switch defects make the Subject Vehicles unreasonably dangerous.  Because of the defects, the Subject Vehicles are likely to be involved in accidents, and, if accidents occur, there is an unreasonable and extreme risk of serious bodily harm or death to the vehicle's occupants.

22.     The Subject Vehicles have been linked to at least 31 crashes and 13 deaths, but the actual numbers are believed to be much higher.

23.     The ignition switch defects present a significant and unreasonable safety risk exposing Subject Vehicle owners and their passengers to a risk of serious injury or death.

24.     For many years, GM has known of the ignition switch defects that exist in millions of Subject Vehicles sold in the United States.  But, to protect its profits and maximize sales, GM concealed the defects and their tragic consequences and allowed unsuspecting vehicle owners to continue driving highly dangerous vehicles.

25.     Under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"), 49 U.S.C. §§ 30101-30170 and its accompanying regulations, when a manufacturer learns that a vehicle contains a

1    safety defect, the manufacturer must promptly disclose the defects, 49 U.S.C.

2    § 30118(c)(1) & (2).   If it is determined that the vehicle is defective, the

3    manufacturer must notify vehicle owners, purchasers, and dealers of the defect and

4    must remedy the defect, 49 U.S.C. § 30118(b)(2)(A) & (B).

5        26.    In addition to the TREAD Act and other laws, GM violated the

6    Michigan Consumer Protection Act (the "MCPA") and fraudulently concealed the

7    deadly ignition switch defects from consumers, owners, and lessees of the Subject

8    Vehicles.  GM also violated the TREAD Act by failing to timely inform NHTSA of

9    the ignition switch defects and allowed cars to remain on the road with these

10   defects.   GM's violations of the TREAD Act also constitute violations of

11   California, Oklahoma, South Carolina, Colorado and Florida law.

12       27.    Plaintiffs    and   the   Class   have   been   damaged   by   GM's

13   misrepresentations, concealment and non-disclosure of the ignition switch defects

14   in the Subject Vehicles, as they are now in possession of dangerous vehicles the

15   value of which has greatly diminished because of GM's failure to timely disclose

16   the serious defect.

17       28.    Plaintiffs and the Class were also damaged by the acts and omissions

18   of Old GM for which GM is liable through successor liability because the Subject

19   Vehicles they purchased are worth less than they would have been without the

20   ignition switch defects.

21       29.    Plaintiffs and the Class paid more for the Subject Vehicles than they

22   would have had they known of the ignition defects or they would not have

23   purchased the Subject Vehicles at all.

24   II.    **JURISDICTION AND VENUE**

25       30.    This Court has diversity jurisdiction over this action under 28 U.S.C.

26   § 1332(a) and (d) because the amount in controversy for the Class exceeds

27   $5,000,000, and Plaintiffs and other Class members are citizens of a different state

28   than Defendant.

6

31.    This Court has personal jurisdiction over Plaintiffs because Plaintiffs hereby submit to the Court's jurisdiction.  This Court has personal jurisdiction over GM because GM conducts substantial business in this District, and some of the actions giving rise to the complaint took place in this District.

32.    Venue is proper in this District under 28 U.S.C. § 1391 because GM, as a corporation, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.  Additionally, GM transacts business within the District, and some of the events establishing the claims arose in this District.

III.    **PARTIES**

33.    Plaintiff Marguerite Chandler is a resident and citizen of Conway, South Carolina.  Plaintiff owns a Chevrolet Cobalt from the 2005-07 time frame. Plaintiff chose the Chevrolet Cobalt in part because she wanted a safely designed and manufactured vehicle.  Plaintiff did not learn of the ignition switch defects until about March 2014.  Had Defendants disclosed the ignition switch defects, Plaintiff would not have purchased her Chevrolet Cobalt, or would have paid less than she did.

34.    Plaintiff James Evans is a resident and citizen of Alva, Oklahoma. Plaintiff owns a Chevrolet Cobalt from the 2005-07 time frame.  Plaintiff chose the Chevrolet Cobalt in part because he wanted a safely designed and manufactured vehicle.  Plaintiff did not learn of the ignition switch defects until about March 2014.  Had Defendants disclosed the ignition switch defects, Plaintiff would not have purchased his Chevrolet Cobalt, or would have paid less than he did.

35.    Plaintiff Bonita LaGoe is a resident and citizen of Grand Ledge, Michigan.  Plaintiff owns a Saturn ION from the 2003-2007 time frame.  Plaintiff chose the Saturn ION in part because she wanted a safely designed and manufactured vehicle.  Plaintiff did not learn of the ignition switch defects until about March 2014.  Had Defendants disclosed the ignition switch defects, Plaintiff would not have purchased her Saturn ION, or would have paid less than she did.

36.     Plaintiff Lianne LaReine is a resident and citizen of Ranchos Palos Verdes, California.  Plaintiff owns a 2007 Saturn Sky.  Plaintiff chose the Saturn Sky in part because she wanted a safely designed and manufactured vehicle. Plaintiff did not learn of the ignition switch defects until about March 2014.  Had Defendants disclosed the ignition switch defects, Plaintiff would not have purchased her Saturn Sky, or would have paid less than she did.

37.     Plaintiff Lea Jordanides is a resident and citizen of Kissimmee, Florida.   Plaintiff owns a Chevrolet Cobalt from the 2005-2007 time frame. Plaintiff chose the Chevrolet Cobalt in part because she wanted a safely designed and manufactured vehicle.  Plaintiff did not learn of the ignition switch defects until about March 2014.  Had Defendants disclosed the ignition switch defects, Plaintiff would not have purchased her Chevrolet Cobalt, or would have paid less than she did.

38.     Plaintiff Yvonne E. Rodriguez is a resident and citizen of Lakewood, Colorado.  Plaintiff owns a 2007 Chevrolet HHR.  Plaintiff chose the HHR in part because she wanted a safely designed and manufactured vehicle.  Plaintiff did not learn of the ignition switch defects until about March 2014.   Had Defendants disclosed the ignition switch defects, Plaintiff would not have purchased her HHR, or would have paid less than she did.

39.     Defendant General Motors LLC ("GM") is a foreign limited liability company formed under the laws of Delaware with its principal place of business located at 300 Renaissance Center, Detroit, Michigan.  GM was incorporated in 2009 and on July 10, 2009 acquired substantially all assets and assumed certain liabilities of General Motors Corporation ("Old GM.") through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.

40.     Defendant Delphi Automotive PLC ("Delphi") is headquartered in Gillingham, Kent, United Kingdom, and is the parent company of Delphi Automotive Systems LLC, which is headquartered in Troy, Michigan.

3136095v1/014242

41.  Among the liabilities and obligations expressly retained by GM after the bankruptcy are the following:

> From and after the Closing, Purchaser [GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by [Old GM].

42.  GM also expressly assumed:

> all Liabilities arising under express written warranties of [Old GM] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by [Old GM] or Purchaser prior to or after the Closing and (B) all obligations under Lemon Laws.

43.  Because GM acquired and operated Old GM and ran it as a continuing business enterprise, and because GM was aware from its inception of the ignition switch defects in the Subject Vehicles, GM is liable through successor liability for the deceptive and unfair acts and omissions of Old GM, as alleged in this Complaint.

44.  Delphi began as a wholly-owned subsidiary of General Motors Corporation, until it was launched as an independent publicly-held corporation in 1999.

3136095v1/014242

45.   In 2005, Delphi declared Chapter 11 bankruptcy.  After emerging from bankruptcy in 2009, GM purchased certain Delphi assets, including Delphi's steering assets, and four Delphi plants to assist with its post-bankruptcy restructuring.  In 2011, GM finally ended its ownership interest in Delphi by selling back the assets.

46.   At all times relevant herein, Delphi, through its various entities, designed, manufactured, and supplied GM with motor vehicle components, including the subject ignition switches.

47.   The GM Companies and Delphi are collectively referred to in this Complaint as "Defendants."

IV.   **DEFENDANTS' WRONGFUL COURSE OF CONDUCT**

A.   **THE IGNITION SWITCH DEFECTS IN THE SUBJECT VEHICLES**

48.   Given the importance that a vehicle and its electrical operating systems remain operational during ordinary driving conditions, it is imperative that a vehicle manufacturer ensure that its vehicles remain operational from the time the driver starts the vehicle until the driver intentionally shuts down the vehicle.  With respect to the Subject Vehicles, Defendants have failed to do so.

49.   In the Subject Vehicles, the ignition switch defects can cause the car's engine and electrical system to shut off, disabling the power steering and power brakes and causing the non-deployment of the vehicle's airbags in the event of a crash.

50.   As the National Highway Traffic Safety Administration (NHTSA) recognized in its written statements to Congress on April 1, 2014: "Airbags are a vitally important, supplemental restraint system used to mitigate injuries and death in the event of a crash."

51.   The Subject Vehicles are, therefore, unreasonably prone to be involved in accidents, and those accidents are unreasonably likely to result in serious bodily

3136095v1/014242

1   harm or death to the drivers and passengers of the Subject Vehicles, as well as to

2   other vehicle operators and pedestrians.

3       **B.    GM KNEW OF THE IGNITION SWITCH DEFECTS FOR**

4            **YEARS, BUT CONCEALED THE DEFECTS FROM**

5            **PLAINTIFFS AND THE CLASS**

6       52.    Both Old GM and GM knew of the deadly ignition switch defects and

7   their dangerous consequences for many years, but concealed their knowledge from

8   Subject Vehicle owners.  The following chronology makes Old GM and GM's

9   misconduct clear, as further detailed in a March 30, 2014 memorandum by the

10  majority staff of the Committee on Energy and Commerce, within the United States

11  House of Representatives, and the April 1, 2014 congressional hearings entitled

12  "The GM Ignition Switch Recall: Why Did It Take So Long?"  A letter to GM from

13  the Committee dated March 31, 2014 also demonstrates that GM knew its switches

14  failed to meet internal company specifications.

15      53.    <u>Late 1990s/Early 2000s</u>: GM and supplier Eaton Mechatronics

16  finalized the specifications for the ignition switch for the Saturn Ion.  Eaton

17  Corporation sold its Vehicle Switch/Electronic Division to Delphi Automotive

18  Systems LLC ("Delphi Automotive" or "Delphi") on March 31, 2001.

19      54.    <u>2001</u>: A pre-production report for the MY 2003 Saturn Ion identified

20  issues with the ignition switch.  In a section entitled "Root Cause Summary," the

21  report states that the "two causes of failure" were "[l]ow contact force and low

22  detent plunger force."  The report stated that a design change resolved the problem.

23      55.    <u>February 2002</u>: Delphi, GM's ignition switch supplier for the recalled

24  vehicles, submitted a Production Part Approval Process (PPAP) document for the

25  switch.  During a briefing, Delphi officials told the Congressional Committee staff

26  that GM approved the PPAP *even though sample testing of the ignition switch*

27  *torque was well below the original specifications set by GM*.

28

11

3136095v1/014242

56.   November 2004: GM opened an engineering inquiry, Problem Resolution Tracking System N172404 ("2004 PRTS"), to examine the complaint "vehicle can be keyed off with knee while driving" in a 2005 Chevrolet Cobalt

57.   February 2005: As part of the 2004 PRTS, GM engineers met to consider possible solutions to address low key torque - the force required to turn the switch.  The PRTS document indicates that the engineers considered increasing or changing the ignition switch "torque effort," but were advised by the ignition switch engineer that it is "close to impossible to modify the present ignition switch" as the switch is "very fragile and doing any further changes will lead to mechanical and/or electrical problems." The 2004 PRTS document indicates that potential solutions were developed for consideration.  After internal evaluations, engineers were directed to look into a key slot change as a "containment," including developing cost and timing estimates.

58.   March 2005: The Cobalt Project Engineering Manager's (PEM) "directive" was to close the 2004 PRTS "with no action." The main reasons cited for the decision were "lead-time for all solutions is too long," "tooling cost and piece price are too high," and "[n]one of the solutions seems to fully countermeasure the possibility of the key being turned (ignition turned off) during driving." The PRTS entry concluded that "none of the solutions represents an acceptable business case."

59.   May 2005: A new Problem Resolution Tracking System (PRTS N182276 or "2005 PRTS") is opened to examine the 2005 Chevrolet Cobalt a customer complaint that the "vehicle ignition will turn off while driving."  The 2005 PRTS document noted that the same issue was addressed in the 2004 PRTS (N172404) and closed, but "[d]ue to the level of buyback activity that is developing in the field, Brand Quality requests that the issue be reopened." One proposed solution was changing the key ring slot to a hole and using a smaller key ring.  In

the chronology attached to the GM February 24, 2014, Letter to NHTSA, GM acknowledges that this proposal was approved but later cancelled.

60. <u>July 2005</u>: A 2005 Chevrolet Cobalt crashes in Maryland, killing the driver. On August 15, 2005, NHTSA Special Crash Investigations (SCI) Program assigned the Calspan Crash Data Research Center to conduct an investigation (or SCI), which found that the frontal airbag system did not deploy. The vehicle's Sensing Diagnostic Module (SDM) data indicated that the "vehicle power mode status" was in "Accessory."

61. <u>August 2005</u>: NHTSA begins the Special Crash Investigation of the July 2005 accident. Documents produced to the Committee indicate that GM reported this crash in its Third Quarter 2005 EWR to NHTSA. NHTSA responded to the report on March 1, 2006, and requested certain information which GM provided.

62. <u>December 2005</u>: GM issued a Service Bulletin 05-02-35-007 with the subject "Information on Inadvertent Turning Off of Key Cylinder, Loss of Electrical System and No DTCs" for the Chevrolet Cobalt and HHR, Saturn Ion, and Pontiac Solstice and Pursuit (Canada only). In the GM February 24, 2014 chronology, GM states that the 2005 PRTS process led to this bulletin. The Service Bulletin informed the dealer of the identified issue with the ignition and recommended potential remedies including removing heavy items from key rings. According to February 24, 2014, chronology submitted to NHTSA, "GM concluded in December 2005 that the service bulletin and field service campaign were the appropriate response to the reported incidents, given that the car's steering and braking systems remained operational even after a loss of engine power, and the car's engine could be restarted by shifting the car into either neutral or park."

63. <u>April 26, 2006</u>: A GM design engineer responsible for the ignition switch in the recalled vehicles signed a form entitled "General Motors Commodity Validation Sign-Off" authorizing Delphi to implement changes in the ignition

switch.  The form explained that a "new detent plunger . . . was implemented to increase torque performance in the switch."  According to Delphi officials, sample testing prior to this approval suggested a significant increase in torque performance but the values were still below GM's original specifications.  The modified ignitions began to appear in 2007 model year vehicles for all models affected by the recall.  In its chronology submitted to NHTSA on February 24, 2014, GM acknowledged that the new ignition switch, however, was not reflected in a corresponding change in part number.

64.  <u>October 2006</u>: A 2005 Chevrolet Cobalt crashes in Wisconsin, killing the driver.  NHTSA SCI Program assigned Indiana University Transportation Research Center to investigate the crash, and the contractor inspected the vehicle on November 6, 2006.  GM reported this crash in its Fourth Quarter 2006 Early Warning Reporting (EWR) filing.  On May 7, 2007, NHTSA requested additional information from GM which it provided on June 7, 2007.  GM then updated the December 2005 Service Bulletin (05-02-35-007) to include additional models and model years: the 2007 Saturn Ion and Sky, 2007 Chevrolet HHR, and 2007 Pontiac Solstice and G5.  As a result of the Service Bulletins, GM provided key inserts to 474 customers who brought their vehicles to the dealer for service.

65.  <u>March 2007</u>: NHTSA and GM met to discuss occupant restraint systems.  To date, the Committee has received limited documentation associated with this meeting.  GM's February 24 chronology indicates that a NHTSA representative informed GM about a July 29, 2005 fatal crash.  It appears this is the same crash that was the subject of the SCI.  After the meeting, GM began tracking front impact crashes involving Cobalts where the air bags did not deploy in order to track similarities in the incidents.  GM identified 10 incidents by the end of 2007.  In four cases the ignition had moved into the "accessory" position.  Comparable information was unavailable for the Saturn Ion because the SDM sensors installed in these vehicles did not record whether the engine was running.

14

66.   April 25, 2007: Indiana University submitted its draft of the 2006 SCI to the NHTSA SCI Program.  The SCI report stated that the "crash is of special interest because the vehicle was equipped with . . . dual state air bags that did not deploy."  The SCI report concluded that the airbags did not deploy "as a result of the impact with the clump of trees, possibly due to the yielding nature of the tree impact or power loss due to the movement of the ignition switch just prior to impact."  The Event Data Recorder (EDR) for the vehicle indicated that the power node status was "accessory" at the time of impact.  The report also noted that the investigation revealed that contact with the ignition switch could result in "engine shut down and loss of power," and cited the service bulletin issued on October 25, 2006.  The report stated that it was unclear what role "if any" the ignition switch issue played in the non-deployment of the airbags.

67.   August 2007: GM met with its SDM supplier, Continental, to review SDM data from a crash of a 2005 Chevrolet Cobalt where the airbags failed to deploy.

68.   September 2007: The Chief of the Defects Assessment Division (DAD) within NHTSA's Office of Defects Investigation (ODI) emailed other ODI officials and proposed an investigation of "frontal airbag non-deployment in the 2003-2006 Chevrolet Cobalt/Saturn Ion."  The DAD Chief went on to state that the "issue was promoted by a pattern of reported non-deployments in VOQ [Vehicle Owners' Questionnaire] complaints that was first observed in early 2005.  Since that time, [the Defects Assessment Division] has followed up on the complaints, enlisted the support of NCSA's Special Crash Investigations (SCI) team, discussed the matter with GM, and received a related EWD Referral.  Notwithstanding GM's indications that they see no specific problem pattern, DAD perceives a pattern of non-deployments in these vehicles that does not exist in their peers . . . ."

69.   November 15, 2007: ODI IE panel reviewed the proposal to open an investigation into non-deployment of airbags in 2003-2006 Cobalts and Ions.  A

PowerPoint presentation prepared by the DAD and dated November 17, 2007, states that its review was prompted by 29 Complaints, 4 fatal crashes, and 14 field reports. During a briefing with Committee staff, ODI officials explained that the panel did not identify any discernable trend and decided not to pursue a more formal investigation.

70. <u>February 2009</u>: GM opened another investigation into the ignition resulting in a redesign of the ignition key for model year 2010 Cobalt.

71. <u>April 2009</u>: A 2005 Chevrolet Cobalt crashed in Pennsylvania, killing the Cobalt driver and front-seat passenger. NHTSA SCI Program assigned the Calspan Crash Data Research Center to investigate the crash, and the contractor inspected the vehicle on April 6 and 7, 2009.

72. <u>May 15, 2009</u>: GM again met with its SDM supplier, Continental, and requested that Continental download SDM data from a 2006 Chevrolet Cobalt accident where the airbags failed to deploy.

73. <u>February 2010</u>: Calspan Crash Data Research Center submitted its 2009 SCI Report, finding that the airbags did not deploy at the time of the crash and that the "cause of the air bag non-deployment in this severe crash could not be determined." The data from the Cobalt's SDM indicated that the Vehicle Power Mode Status was in "Accessory."

74. <u>2010</u>: ODI again considered Cobalt trend information on non-deployment but determined the data did not show a trend.

75. <u>August 2011</u>: GM initiated a Field Performance Evaluation (FPE) to examine a group of frontal impact crashes involving the 2005-2007 Chevrolet Cobalt and the 2007 Pontiac G5 and airbag non-deployment. The FPE included a review of information related to the Ion, HHR and Solstice.

76. <u>May 2012</u>: GM engineers tested the torque performance of 44 vehicles across a range of make and model years. Results revealed that the majority of vehicles tested from model years 2003 to 2007 exhibited torque performance at or

below 10 Newton cm (N-cm), below the original specifications established by GM. The results also revealed a shift in torque performance beginning in MY2007 vehicles built late in 2006 and all subsequent model years. The torque performance for these vehicles ranged from just below 15 N-cm to 20 N-cm. At the time, GM engineers could not explain the shift or discrepancies in torque performance.

77.   September 2012: A GM Field Performance Assessment Engineer emailed a GM Red X Engineer to request assistance in examining the changes between the 2007 and 2008 Chevrolet Cobalt Models. Based on a briefing with GM, Committee staff's understanding is that GM Red X engineers are assigned to find the root cause of engineering or technical problems.

78.   April 2013: GM learned there was a difference in the torque performance of a GM service part ignition switch purchased after 2010 compared to the original ignition switch installed in a 2005 Cobalt. In response, GM hired an outside engineering firm to conduct a thorough ignition switch investigation. The external expert concluded that ignition switches installed in early model Cobalt and Ion vehicles did not meet GM's torque specification and that a change to the switch made several years later provided a likely explanation for the variance in torque performance. Data within the external report also indicated that vehicles with the modified ignition switch exhibited torque performance consistent with GM's design specification.

79.   October 2013: GM received documentation from Delphi demonstrating that a change to the ignition switch in the Cobalt and other vehicles was made in April 2006.

80.   December 2013: The Field Performance Assessment Engineer presented the results of their analysis to the Field Product Evaluation Recommendation Committee (FPERC) and the Executive Field Action Decision Committee (EFADC).

3136095v1/014242

81.   December 17, 2013: The EFADC met to review the findings. Questions were raised at the meeting that prompted additional analysis.

82.   January 31, 2014: A second EFADC meeting was convened and resulted in a decision to conduct a safety recall of model year 2005-2007 Chevrolet Cobalt and Pontiac G5 vehicles.   At the time, the EFDAC was only asked to consider a recall of these vehicles.

83.   February 2014: Additional analysis was performed of data related to the Saturn Ion, Chevrolet HHR, and Pontiac Solstice and Sky vehicles.   This analysis revealed earlier reports of concerns with the ignition switch in Ion vehicles.

84.   February 13, 2014: GM announced a recall of 2005-2007 model year Chevrolet Cobalt and Pontiac G5 vehicles to address a fault with the ignition switch that may permit the key to inadvertently turn to the "off" or "accessory" position, resulting in a loss of power to the engine and many electrical components in the vehicle.

85.   February 24, 2014: GM submitted a detailed timeline to NHTSA pertaining to the Cobalt and Pontiac G5 recall.   David Friedman, acting administrator of NHTSA, told Congress on April 1, 2014:  "In February 2014, GM submitted information to NHTSA that, for the first time, acknowledged a link between the ignition switch to the airbag non-deployment, as well as key information regarding parts changes, discussions with suppliers, and other efforts currently under consideration in our Timeliness Query.  Had the information newly provided to NHTSA by GM been available before now, it would have better informed the agency's prior reviews of airbag non-deployment in GM vehicles and likely would have changed NHTSA's approach to this issue."

86.   February 24, 2014: GM convened another EFADC meeting to review additional analysis related to the Saturn Ion and Sky, Chevrolet HHR, and Pontiac Solstice.   The EFADC ordered a safety recall for certain model years of these vehicles.

18

87.   <u>February 25, 2014</u>: GM expanded the recall to include additional 2003-2007 model year vehicles.  These include the MY 2003-2007 Saturn Ion, MY 2006-2007 Chevrolet HHR and Pontiac Solstice, and MY 2007 Saturn Sky.  As a result of this expansion, the total number of vehicles subject to the recall rose to approximately 1.6 million worldwide, including more than 1.3 million in the United States.  GM also acknowledged the importance of the specification for setting torque in the recall notice, stating:   "If the torque performance is not to specification, and the key ring is carrying added weight or the vehicle goes off road or experiences some other jarring event, the ignition switch may inadvertently be moved out of the 'run' position."

88.   <u>March 4, 2014</u>: NHTSA opened Timeliness Query TQ14-001 "to evaluate the timing of GM's defect decision-making and reporting of the safety defect to NHTSA."

89.   <u>March 11, 2014</u>: GM submitted a detailed timeline to NHTSA related to the subsequent recall of the Saturn Ion, Saturn Sky, Chevrolet HHR and Pontiac Solstice.  That timeline showed GM had received reports as early as 2001 — three years earlier than previously disclosed — of a safety defect in its cars.  The new chronology also showed that GM in 2012 identified two nonfatal crashes involving Saturn Ions that may have been related to the ignition problem.  GM admits there were a total of eight frontal-impact crashes involving the Ion in which air bags failed to deploy, four resulting in deaths. *See http://www.nytimes.com /2014/03/13/business/gm-reveals-it-was-told-of-ignition-defect-in-01.html*.

90.   <u>March 28, 2014</u>: GM again expanded the ignition switch recall to cover all model years of the Chevrolet Cobalt and HHR, the Pontiac G5 and Solstice, and the Saturn Ion and Sky in the United States.  This second expansion of the ignition switch recall covers an additional 824,000 vehicles in the U.S., bringing the number of recalled vehicles to 2,191,146.

3136095v1/014242

91.   <u>April 1-2, 2014</u>: GM CEO Mary Barra appeared at two days of congressional hearing in which she was questioned about by members of the House and then Senate, who accused GM of having "a culture of cover-up" and raised concerns about GM's conduct in concealing information about a deadly safety defect.   *See   http://www.nytimes.com/2014/04/03/business/gm-chief-opens-testimony-to-senate-panel.html*.

92.   <u>April 8, 2014</u>:  NHTSA fines GM $7,000 per day for the automaker's failure to respond fully to the government's requests for information.  In its letter to GM, NHTSA noted that the requests "are basic questions concerning information that is surely readily available to GM at this time.  Moreover, it is deeply troubling that two months after recalling the vehicles, GM is unwilling or unable to tell NHTSA whether the design of the switch changed at any other time."

93.   <u>April 10, 2014</u>: GM places placed two engineers, Ray DeGiorgio and Gary Altman, on paid leave for their roles leading to the recall.

94.   <u>April 10, 2014</u>: GM informs NHTSA that it is adding ignition lock cylinders to its safety recall because the cylinders can allow removal of the ignition key while the engine is running, leading to a possible rollaway, crash and occupant or pedestrian injuries.  GM reports that it is aware of several hundred complaints of keys coming out of ignitions.  The cars covered by this recall were part of the earlier ignition switch defect recalls.

95.   <u>April 15, 2014</u>: Senate Commerce Committee asks Delphi to respond by April 28, 2014 to questions about the fix it proposed but which GM did not adopt to the ignition switch in 2005: "Did Delphi protest this decision at any point or raise any concern that a failure to enact this change could be fatal for consumers who drive vehicles containing the faulty ignition switch?"

96.   <u>April 19, 2014</u>: Underscoring GM's failure to act proactively to address problems, government documents show that GM waited years to recall nearly 335,000 Saturn Ions for power steering failures despite getting thousands of

1    consumer   complaints   and   more   than   30,000   warranty   repair   claims.

2    *http://www.usatoday.com/story/money/cars/2014/04/19/documents-detail-another-*

3    *delayed-gm-recall/7911495/.*

4    97.   While GM has now appointed a new Vehicle Safety Chief, on

5    information and belief at least 2.2 million Subject Vehicles remain on the road to

6    this day; and, on information and belief, other vehicles not yet acknowledged by

7    GM also have the deadly ignition switch defects.

8    **C.   OLD GM PROMOTED THE SUBJECT VEHICLES AS**

9    **SAFE AND RELIABLE**

10   98.   On information and belief, in marketing and advertising materials, Old

11   GM consistently promoted the Subject Vehicles as safe and reliable.

12   99.   For example, one Cobalt ad promised that "Side curtain airbags

13   coupled with OnStar makes every journey the safest possible to assure that you and

14   your occupants will stay safe at all times."

15   100.   An ad for the 2006 Solstice promises that the vehicle "[b]rings power

16   and defines performance."

17   101.   A 2003 television spot for the Saturn vehicle closed with the tagline

18   "Specifically engineered for whatever is next."   Another 2003 spot closed with the

19   tagline "Saturn.  People first."

20   102.   A 2001 print ad touting the launch of the Saturn focused on safety:

21   Need is where you begin.   In cars, it's about things like

22   reliability, durability and, of course, safety.   That's where we

23   started when developing our new line of cars.   And it wasn't

24   until we were satisfied that we added things….

25   103.   In its 2004 corporate responsibility pledge, reported in the "Our

26   Products, Vehicle Safety" section, Old GM stated: "Helping drivers avoid crashes

27   and making vehicles safer is a priority for GM."

28

21

104.   The following year, in or about 2005, Old GM continued its proclamation of dedication to consumers for the safety of its vehicles, acknowledging that its customers "expect and demand vehicles that help them to avoid crashes and reduce the risk of injury in case of a crash."

105.   Old GM made these representations to boost vehicle sales and maximize profits while knowing that the ignition switches in the Subject Vehicles were defective.

106.   Throughout the relevant period, Old GM possessed vastly superior knowledge and information to that of consumers – if not exclusive information – about the design and function of the ignition switches in the Subject Vehicles and the existence of the defects in those vehicles.

107.   Old GM never informed consumers about the ignition switch defects.

D.     **THE IGNITION SWITCH DEFECTS HAVE HARMED PLAINTIFFS AND THE CLASS**

108.   The ignition switch defects have caused damage to Plaintiffs and the Class.

109.   A vehicle purchased, leased or retained with a serious safety defect is worth less than the equivalent vehicle leased, purchased or retained without the defect.

110.   A vehicle purchased, leased or retained under the reasonable assumption that it is safe is worth more than a vehicle known to be subject to the unreasonable risk of catastrophic accident because of the ignition switch defects.

111.   Purchasers and lessees paid more for the Subject Vehicles, through a higher purchase price or higher lease payments, than they would have had the ignition switch defects been disclosed.  Plaintiffs and the Class overpaid for their Subject Vehicles.  Because of the concealed ignition switch defects, Plaintiffs did not receive the benefit of the bargain.

3136095v1/014242

112. Plaintiffs and the Class are stuck with unsafe vehicles that are now worth less than they would have been but for GM's failure to disclose the ignition switch defects.

113. GM admits to at least 13 deaths resulting from accidents linked to the ignition switch defects in the Subject Vehicles. However, Plaintiffs believe that the actual number is much higher, and that there may have been hundreds of deaths and injuries attributable to the ignitions switch defects.

## V.   **SUCCESSOR LIABILITY**

114. As discussed above, GM expressly assumed certain obligations under, *inter alia*, the TREAD Act, and is liable for its non-disclosure of the ignition switch defects from the date of its formation on July 10, 2009.

115. GM has successor liability for Old GM's acts and omissions in the marketing and sale of the Subject Vehicles because it has continued the business enterprise of Old GM, for the following reasons:

(a) GM admits that it knew of the ignition system defects from the very date of its formation;

(b) GM has continued in the business of designing, manufacturing, and marketing vehicles, including at least some of the same vehicles as Old GM;

(c) GM retained the bulk of the employees of Old GM;

(d) GM acquired owned and leased real property of Old GM, including all machinery, equipment, tools, information technology, product inventory, and intellectual property;

(e) GM acquired the contracts, books, and records of Old GM; and

(f) GM acquired all goodwill and other intangible personal property of Old GM.

3136095v1/014242

VI.   **TOLLING OF THE STATUTES OF LIMITATION**

116.   All applicable statutes of limitation have been tolled by GM's knowing and active fraudulent concealment and denial of the facts alleged herein.  Plaintiffs and Class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Old GM and GM did not report information within their knowledge to federal authorities (NHTSA) or consumers, nor would a reasonable and diligent investigation have disclosed that Old GM and GM had information in their possession about the existence and dangerousness of the defect and opted to conceal that information until shortly before this class action was filed.

117.   Indeed, Old GM instructed its service shops to provide Subject Vehicle owners with a new key ring if they complained about unintended shut down, rather than admit what Old GM knew – that the ignition switches were dangerously defective and warranted replacement with a properly designed and built ignition system.

118.   Old GM and GM were, and GM remains, under a continuing duty to disclose to NHTSA, Plaintiffs, and the Class the true character, quality, and nature of the Subject Vehicles; that this defect is based on dangerous, inadequate, and defective design and/or substandard materials; and that it will require repair, poses a severe safety concern, and diminishes the value of the Subject Vehicles.

119.   Because of the active concealment by Old GM and GM, any and all limitations periods otherwise applicable to Plaintiffs' claims have been tolled.

VII.   **CLASS ALLEGATIONS**

120.   Under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and a Class initially defined as follows:

> All persons in the United States who currently own or lease one
> or more of the following GM vehicles:  2005-2010 Chevrolet

24

Cobalt; 2006-2010 Pontiac Solstices; 2007-2010 Pontiac G5; 2007-2010 Saturn Skys; 2006-2011 Chevrolet HHR; and 2003-2007 Saturn Ions.  This list will be supplemented to include other GM vehicles that have the defective ignition switches, which inadvertently turn off the engine and vehicle electrical systems during ordinary driving conditions.

121.   Plaintiffs also bring this action on behalf of the following State Subclasses:

**California Subclass**: All Class Members who reside in and purchased or leased a Defective Vehicle in the State of California ("California Subclass").

**Oklahoma Subclass**: All Class Members who reside in and purchased or leased a Defective Vehicle in the State of Oklahoma ("Oklahoma Subclass").

**South Carolina Subclass**: All Class Members who reside in and purchased or leased a Defective Vehicle in the State of South Carolina ("South Carolina Subclass").

**Colorado Subclass**: All Class Members who reside in and purchased or leased a Defective Vehicle in the State of Colorado ("Colorado Subclass").

**Florida Subclass**: All Class Members who reside in and purchased or leased a Defective Vehicle in the State of Florida ("Florida Subclass").

122.   Excluded from the Class are Defendants, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case, and all persons within the third degree

25

of relationship to any such persons.  Also excluded are any individuals claiming damages from personal injuries allegedly arising from the Subject Vehicles.

123.  Plaintiffs are informed and believe that the GM Companies manufactured and sold to consumers at least 2.2 million of the Subject Vehicles nationwide and hundreds-of-thousands of Subject Vehicles in the Subclass States. Individual joinder of all Class or Subclass members is impracticable.

124.  The Class can be readily identified using registration records, sales records, production records, and other information kept by GM or third parties in the usual course of business and within their control.

125.  Questions of law and fact are common to the Class and the Subclass and predominate over questions affecting only individual members, including the following:

    (a)    Whether the Subject Vehicles suffer from ignition switch defects;

    (b)    Whether Defendants concealed the defects;

    (c)    Whether Defendants misrepresented that the Subject Vehicles were safe;

    (d)    Whether Defendants engaged in fraudulent concealment;

    (e)    Whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Subject Vehicles were designed, manufactured, and sold with defective ignition switches;

    (f)    Whether the alleged conduct by Defendants violated laws as Plaintiffs allege;

26

3136095v1/014242

(g)   Whether Defendants' unlawful, unfair and/or deceptive practices harmed Plaintiffs and the members of the Class

(h)   Whether Defendants violated the Michigan Consumer Protection Act ("MCPA"), Mich. Comp. L. Ann. § 445.901, *et seq.* and, if so, what remedies are available for the Class;

(i)   Whether Defendants violated California law, including Cal. Bus. & Prof. Code § 17200, et seq. and Cal. Bus. & Prof. Code § 17500, et seq. and if so, what remedies are available for the California Subclass;

(j)   Whether Defendants violated Oklahoma law, including Okla. Stat. tit. 15 § 751, *et seq* and Okla. Stat. Ann. § 51, *et seq.* and if so, what remedies are available for the Oklahoma Subclass;

(k)   Whether Defendants violated Colorado law, including Col. Rev. Stat. § 6-1-101., *et seq* and, if so, what remedies are available for the Colorado Subclass;

(l)   Whether Defendants violated Florida law, including Fla. Stat. § 501.201, *et seq.* and, if so, what remedies are available for the Florida Subclass;

(m)   Whether Defendants violated Florida law, including S.C. Code Ann. § 39-5-10, *et seq.* and, if so, what remedies are available for the South Carolina Subclass;

(n)   Whether Plaintiffs and the members of the Class are entitled to equitable and/or injunctive relief; and

(o)   Whether, and to what extent, GM has successor liability for the acts and omissions of Old GM.

27

126.   Plaintiffs' claims are typical of the claims of the Class members, and arise from the same course of conduct by GM and Old GM.  The relief Plaintiffs seek are typical of the relief sought for the absent Class members.

127.   Plaintiffs will fairly and adequately represent and protect the interests of all absent Class members.  Plaintiffs are represented by counsel competent and experienced in product liability, consumer protection, and class action litigation.

128.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual Class members is impracticable.  Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, and the burden imposed on the judicial system would be enormous.

129.   The prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications for individual Class members, which would establish incompatible standards of conduct for GM.  The conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

130.   Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.  Plaintiffs anticipate providing appropriate notice to be approved by the Court after discovery into the size and nature of the Class.

131.   Classwide declaratory, equitable, and injunctive relief is appropriate because Defendants have acted on grounds that apply generally to the Class and Subclasses, and inconsistent adjudications with respect to the Defendants' liability would establish incompatible standards and substantially impair or impede the ability of Class and Subclass members to protect their interests.  Classwide relief

1    assures fair, consistent, and equitable treatment and protection of all Class and

2    Subclass members, and uniformity and consistency in Defendants' discharge of

3    their duties to perform corrective action regarding the defective ignition switches.

4    VIII.  **CLAIMS FOR RELIEF**

5                          **FIRST CLAIM FOR RELIEF**

6                          FRAUDULENT CONCEALMENT

7                   **Asserted on Behalf of the Nationwide Class**

8        132.   Plaintiffs and the Class incorporate by reference each preceding and

9    following paragraph as though fully set forth at length herein.

10       133.   This claim is brought on behalf of the nationwide Class.

11       134.   GM concealed and suppressed material facts concerning the ignition

12   switch defects, and GM also has successor liability for the acts of concealment and

13   oppression of Old GM as set forth above.

14       135.   Delphi also concealed and suppressed material facts concerning the

15   ignition switch defects.

16       136.   The Defendants (the GM Companies and Delphi) had a duty to

17   disclose the ignition switch defects because they were known and accessible only to

18   the Defendants who had superior knowledge and access to the facts, and the

19   Defendants knew they were not known to or reasonably discoverable by Plaintiffs

20   and the Class.   These omitted and concealed facts were material because they

21   directly impact the safety of the Subject Vehicles.  Whether an ignition switch was

22   designed and manufactured with appropriate safeguards is a material safety

23   concern.

24       137.   The Defendants actively concealed and/or suppressed these material

25   facts, in whole or in part, to protect their profits and avoid a costly recall, and they

26   did so at the expense of Plaintiffs and the Class.

27       138.   On information and belief, the Defendants still have not made full and

28   adequate disclosure and continue to defraud Plaintiffs and the Class and conceal

3136095v1/014242

1  material information regarding the defects that exist in the Subject Vehicles and

2  other GM vehicles.

3      139.  Plaintiffs and the Class were unaware of these omitted material facts

4  and would not have acted as they did if they had known of the concealed and/or

5  suppressed facts.  Plaintiffs' and the Class's actions were justified.  The Defendants

6  were in exclusive control of the material facts and such facts were not known to the

7  public, Plaintiffs, or the Class.

8      140.  Because of the concealment and/or suppression of the facts, Plaintiffs

9  and the Class sustained damage because they purchased and retained vehicles that

10  are now diminished in value from what they would have been had the Defendants

11  timely disclosed the ignition switch defects.

12      141.  The  Defendants'  acts  were  done  maliciously,  oppressively,

13  deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the

14  Class's rights and well-being to enrich Defendants.  The Defendants' conduct

15  warrants an assessment of punitive damages in an amount sufficient to deter such

16  conduct in the future, which amount is to be determined according to proof.

17                    **SECOND CLAIM FOR RELIEF**

18          VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW

19                  (Cal. Bus. & Prof. Code § 17200, et seq.)

20              **Asserted on Behalf of the California Subclass**

21      142.  Plaintiff hereby incorporates by reference the allegations contained in

22  the preceding paragraphs of this Complaint as if fully set forth herein.

23      143.  California Business and Professions Code section 17200 prohibits acts

24  of "unfair competition," including any "unlawful, unfair or fraudulent business act

25  or practice" and "unfair, deceptive, untrue or misleading advertising."  As described

26  herein, Defendants engaged in conduct that violated each of this statute's

27  enumerated prohibited acts.

28

3136095v1/014242

144. Defendants committed an unlawful business act or practice by violating the National Traffic and Motor Vehicle Safety Act of 1996, codified at 49 U.S.C. § 30101, *et seq*., and its regulations.  Under the TREAD Act, 49 U.S.C. § 30101, *et seq*, and its accompanying regulations, if a manufacturer learns that a vehicle contains a defect and that defect is related to motor vehicle safety, the manufacturer must disclose the defect.  49 U.S.C. § 30118(c)(1)&(2).

145. Defendants committed unfair business acts and practices in violation of section 17200 when they concealed the existence and nature of the ignition switch defect and represented that the Subject Vehicles were reliable and safe when, in fact, they are not.  The ignition switch defect presents a safety hazard for occupants of the Subject Vehicles.

146. Defendants committed fraudulent business acts as a result of their misrepresentations and omissions regarding the safety and reliability of the Subject Vehicles.  Touting the vehicles' safety and failing to disclose the dangers inherent in the ignition switch design, as set forth in this Complaint, were likely to deceive a reasonable consumer as to the safety of the vehicles.  Such safety information would be material to a reasonable consumer deciding whether to purchase or lease those vehicles.

147. Defendants engaged in unfair and deceptive advertising practices by manufacturing and selling Subject Vehicles and failing to adequately investigate, disclose and remedy the ignition switch defect.  Defendants' conduct impaired competition within the automotive vehicles market and prevented Plaintiff from making fully informed decisions about whether to purchase or lease Subject Vehicles and/or the price be paid to purchase or lease such Subject Vehicles.

148. Plaintiff LaReine has suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful and/or deceptive practices.  Had Plaintiff LaReine known that her vehicle was defective she would not have purchased or leased and/or paid as much for it.  As a direct and proximate

1   result of Defendants' unfair and deceptive practices, Plaintiff LaReine and

2   California Subclass members have suffered and will continue to suffer actual

3   damages.

4       149.   Plaintiff requests that this Court enter such orders or judgments as may

5   be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or

6   deceptive practices, as provided in Cal. Bus. & Prof. Code § 17203; and for such

7   other relief set forth below.

8                      **THIRD CLAIM FOR RELIEF**

9           VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW

10                 (Cal. Bus. & Prof. Code § 17500, et seq.)

11              **Asserted on Behalf of the California Subclass**

12      150.   Plaintiff hereby incorporates by reference the allegations contained in

13  the preceding paragraphs of this Complaint as if fully set forth herein.  California

14  Business and Professions Code § 17500 makes it "unlawful for any … corporation

15  … with intent directly or indirectly to dispose of real or personal property … to

16  induce the public to enter into any obligation relating thereto, to make or

17  disseminate or cause to be made or disseminated … from this state before the

18  public in any state, in any newspaper or other publication, or any advertising

19  device, … or in any other manner or means whatever, including over the Internet,

20  any statement … which is untrue or misleading, and which is known, or which by

21  the exercise of reasonable care should be known, to be untrue or misleading."

22      151.  Defendants caused to be made or disseminated to consumers

23  throughout California and the United States, advertising, marketing and other

24  publications, statements about the Subject Vehicles that were untrue or misleading,

25  and which were known, or which by the exercise of reasonable care should have

26  been known to the Defendants, to be untrue and misleading.

27      152.  Defendants violated California Business and Professions Code

28  § 17500 because the misrepresentations and omissions regarding the safety and

                                    32

reliability of the Subject Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

153.   Plaintiff and California Subclass members have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful and/or deceptive practices.   Plaintiff and California Subclass members overpaid for their Subject Vehicles and did not receive the benefit of their bargain.

154.   Plaintiff requests that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices with respect to the marketing and sale of the Subject Vehicles, and for such other relief as set forth below.

## FOURTH CLAIM FOR RELIEF

VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT

(The MCPA, Mich. Comp. L. Ann. § 44901, *et seq.*)

**Asserted on Behalf of the Nationwide Class**

155.   Plaintiffs and the Class incorporate by reference paragraphs 1-141 as though fully set forth at length herein.

156.   This claim is brought on behalf of the nationwide Class.

157.   Defendants and Plaintiffs are each "persons" under Mich. Comp. L. Ann. § 445.902(d).

158.   The sale of the Subject Vehicles to Plaintiffs and the Class occurred within "trade and commerce" within the meaning of Mich. Comp. L. Ann. § 445.902(d), and Defendants committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

159.   The MCPA makes unlawful any "unfair, unconscionable, or deceptive methods, acts or practices in the conduct of trade or commerce," as more specifically defined in the MCPA. Mich. Comp. L. Ann. § 445.903 (1).

160.   Defendants have engaged in unfair, unconscionable, and deceptive methods, acts and practices violation of the MCPA.

33

161.  Defendants violated the MCPA by "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer."  Mich. Comp. L. Ann. § 445.903(s).

162.  As alleged above, Defendants knew of the safety ignition defect, while Plaintiffs and the Class were deceived by the Companies' omission into believing the Subject Vehicles were safe, and the information could not have reasonably been known by the consumer until the February and March 2014 recalls.

163.  Defendants also violated the MCPA by "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is." Mich. Comp. L. Ann. § 405.903(bb).  For example, Defendants represented that the Subject Vehicles were safe such that reasonable people believed the represented or suggested state of affairs to be true; namely, that the Subject Vehicles were safe.

164.  Defendants also violated the MCPA by "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. L. Ann. § 405.903(cc).  Defendants represented that the Subject Vehicles were safe, which made it even more incumbent on Defendants to reveal the material fact of the ignition switch defects.

165.  Defendants acts and practices were unfair and unconscionable, because their acts and practices, including the manufacture and sale of vehicles with an ignition switch defect, and Defendants' failure to adequately disclose the defect to NHTSA and the Class and timely implement a remedy, contravene established public policy, and because the harm the Defendants caused consumers greatly outweighs any benefits associated with those practices.  The Defendants' conduct has also impaired competition within the automotive vehicles market and has prevented Plaintiffs and the Class from making fully informed decisions about whether to lease, purchase, and retain Subject Vehicles.

34

166.  While the GM Companies knew of the ignition switch defects by 2001, it continued to design, manufacture, and market the Subject Vehicles until 2007.  While Delphi knew the ignition switch did not meet specification in 2001, it continued to manufacture and sell the switches without disclosing their problems.

167.  All the while, the Defendants knew that the vehicles had an unreasonable propensity to shut down during ordinary driving conditions, leading to an unreasonable risk of serious bodily injury or death.

168.  Plaintiffs and the Class have suffered an injury, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or deceptive practices.  Defendants failed to inform NHTSA, and therefore failed to inform consumers, that the Subject Vehicles had a defective ignition switch that could lead to injury and death.  Had Plaintiffs and the Class known this, they would either not have purchased their vehicles at all or would have paid less for them, and would not have retained their Subject Vehicles.  Plaintiffs and the Class have therefore suffered a "loss" because of the violations of the MCPA complained of herein.

169.  All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of the Defendants' business.

170.  Plaintiffs request that this Court:  enjoin Defendants from continuing its unfair, unlawful, and/or deceptive practices; provide to Plaintiffs and each Class either their actual damages as the result of Defendants' unfair, unlawful, and deceptive trade practices, or $250 per Class member, whichever is higher; award reasonable attorneys' fees; and provide other appropriate relief under Mich. Comp. L. Ann. § 445.911.

171.  Plaintiffs acknowledge that, on its face, the MCPA purports to (i) deprive non-residents of bringing class (but not individual) actions under the MCPA; and (ii) allows individuals (but not class members) the ability to recover a penalty of $250 per person if that amount is greater than their actual damages. After the United States Supreme Court's decision in *Shady Grove Orthopedic Ass.,*

1   *P.A. v. Allstate Ins. Co.*, 589 U.S. 393 (2010), however, any such prohibitions

2   imposed in class actions (but not in individual actions) are trumped and superseded

3   by Fed. R. Civ. P. 23, which imposes no such restrictions.

### FIFTH CLAIM FOR RELIEF

UNJUST ENRICHMENT

(Based on California Law)

### Against the GM Companies

8   172.   Plaintiffs and the Class incorporate by reference paragraphs 1-141 as

9   though fully set forth at length herein.

10   173.   Under the TREAD Act, 49 U.S.C. §§ 30101, *et seq*., and its

11   accompanying regulations, if a manufacturer learns that a vehicle contains a defect

12   and that defect is related to motor vehicle safety, the manufacturer must disclose the

13   defect.  49 U.S.C. § 30118(c)(1) & (2).

14   174.   In acquiring Old GM, GM expressly assumed the obligations to make

15   all required disclosures under the TREAD Act.

16   175.   GM also has successor liability for the deceptive and unfair acts and

17   omissions of Old GM.

18   176.   Under the TREAD Act, if it is determined that the vehicle is defective,

19   the manufacturer must promptly notify vehicle owners, purchasers and dealers of

20   the defect and remedy the defect.  49 U.S.C. § 30118(b)(2)(A) & (B).

21   177.   Under the TREAD Act, manufacturers must also file a report with

22   NHTSA within five working days of discovering "a defect in a vehicle or item of

23   equipment has been determined to be safety related, or a noncompliance with a

24   motor vehicle safety standard has been determined to exist."  49 C.F.R. § 573.6(a)

25   & (b).  At a minimum, the report to NHTSA must include:  the manufacturer's

26   name; the identification of the vehicles or equipment containing the defect,

27   including the make, line, model year and years of manufacturing; a description of

28   the basis for determining the recall population; how those vehicles differ from

1  similar vehicles that the manufacturer excluded from the recall; and a description of
2  the defect.  49 C.F.R. § 276.6(b), (c)(1), (c)(2), & (c)(5).

3      178.   The manufacturer must also promptly inform NHTSA regarding:  the
4  total number of vehicles or equipment potentially containing the defect; the
5  percentage of vehicles estimated to contain the defect; a chronology of all principal
6  events that were the basis for the determination that the defect related to motor
7  vehicle safety, including a summary of all warranty claims, field or service reports,
8  and other information, with its dates of receipt; and a description of the plan to
9  remedy the defect.  49 C.F.R. § 276.6(b) & (c).

10     179.   The TREAD Act provides that any manufacturer who violates 49
11 U.S.C. § 30166 must pay a civil penalty to the U.S. Government.   The current
12 penalty "is $7,000 per violation per day," and the maximum penalty "for a related
13 series of daily violations is $17,350,000."  49 C.F.R. § 578.6(c).

14     180.   From at least 2001, Old GM had knowledge of the ignition switch
15 defect, but hid the problem for the remainder of its existence until 2009.

16     181.   From its creation on July 10, 2009, GM knew of the ignition switch
17 problem because of the knowledge of Old GM and continuous reports up until the
18 present.

19     182.   GM admits the defect in the ignition switch has been linked to at least
20 13 accident-related fatalities.   But other sources have reported that hundreds of
21 deaths and serious injuries are linked to the faulty ignition switches.

22     183.   Despite being aware of the ignition switch defects ever since its
23 creation on July 10, 2009, GM waited until February 7, 2014, before finally sending
24 a letter to NHTSA confessing its knowledge of the ignition switch defects which
25 could cause the vehicles to lose power, and in turn cause the airbags not to deploy.
26 GM initially identified two vehicle models, along with the corresponding model
27 years, affected by the defect -- the 2005-2007 Chevrolet Cobalt and the 2007
28 Pontiac G5.   On February 25, 2014, GM amended its letter to include four

37

3136095v1/014242

1     additional vehicles, the 2006-2007 Chevrolet HHR, 2006-2007 Pontiac Solstice,

2     2003-2007 Saturn Ion, and the 2007 Saturn Sky.  In March 2014, GM expanded the

3     recall to additional model years of the foregoing vehicles.

4        184.   By failing to disclose and by actively concealing the ignition switch

5     defect, and by selling vehicles while violating the TREAD Act and other conduct as

6     alleged herein, Old GM and GM charged a higher price for their vehicles than the

7     vehicles' true value and obtained monies which rightfully belong to Plaintiffs and

8     the Class.

9        185.   Old GM and GM enjoyed the benefit of increased financial gains, to

10    the detriment of Plaintiffs and the Class, who paid a higher price for vehicles which

11    actually had lower values.  It would be inequitable and unjust for Old GM and GM

12    to retain these wrongfully obtained profits.

13       186.   Plaintiffs, therefor, seek an order establishing GM as constructive

14    trustee of the profits unjustly obtained, plus interest.

15                      **SIXTH CLAIM FOR RELIEF**

16       VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT

17             (Okla. Stat. tit. 15 § 751, *et seq.*)

18            **Asserted on Behalf of the Oklahoma Subclass**

19       187.   Plaintiffs and the Class incorporate by reference paragraphs 1-141 as

20    though fully set forth at length herein.

21       188.   The conduct of Defendants as set forth herein constitutes unfair or

22    deceptive acts or practices, including, but not limited to, Defendants' manufacture

23    and sale of vehicles with a faulty ignition switch which Defendants failed to

24    adequately investigate, disclose and remedy, and its misrepresentations and

25    omissions regarding the safety and reliability of its vehicles.

26       189.   Defendants' actions as set forth above occurred in the conduct of trade

27    or commerce.  Defendants' actions impact the public interest because Plaintiffs

28    were injured in exactly the same way as millions of others purchasing and/or

1  leasing the Subject Vehicles as a result of the Defendants' generalized course of

2  deception.  All of the wrongful conduct alleged herein occurred, and continues to

3  occur, in the conduct of the Defendants' business.

4      190.   Plaintiffs and the Class were injured as a result of Defendants'

5  conduct.

6      191.   Plaintiffs overpaid for the Subject Vehicles and did not receive the

7  benefit of their bargain, and their vehicles have suffered a diminution in value.

8      192.   Defendants' conduct proximately caused the injuries to Plaintiffs and

9  the Class.

10     193.   Defendants are liable to Plaintiffs and the Class for damages in

11  amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

12     194.   Pursuant to Okla. Stat. tit. 15 § 751, Plaintiffs will serve the Oklahoma

13  Attorney General with a copy of this complaint as Plaintiffs seek injunctive relief.

14                  **SEVENTH CLAIM FOR RELIEF**

15       VIOLATION OF OKLAHOMA DECEPTIVE TRADE PRACTICES ACT

16                   (Okla. Stat. Ann. § 51, *et seq.*)

17              **Asserted on Behalf of the Oklahoma Subclass**

18     195.   Plaintiffs and the Class incorporate by reference paragraphs 1-141 as

19  though fully set forth at length herein.

20     196.   The conduct Defendants as set forth herein constitutes unfair or

21  deceptive acts or practices, including, but not limited to, Defendants' manufacture

22  and sale of vehicles with a defective ignition switch, which Defendants failed to

23  adequately investigate, disclose and remedy, and its misrepresentations and

24  omissions regarding the safety and reliability of its vehicles.

25     197.   Defendants' actions as set forth above occurred in the conduct of trade

26  or commerce.

27     198.   Defendants' actions impact the public interest because Plaintiffs were

28  injured in exactly the same way as millions of others purchasing and/or leasing the

1   Subject Vehicles as a result of Defendants' generalized course of deception. All of
2   the wrongful conduct alleged herein occurred, and continues to occur, in the
3   conduct of Defendants' business.

4   199. Plaintiffs and the Class were injured as a result of Defendant's
5   conduct. Plaintiffs overpaid for the Subject Vehicles and did not receive the benefit
6   of their bargain, and their vehicles have suffered a diminution in value.

7   200. Defendants' conduct proximately caused the injuries to Plaintiffs and
8   the Class.

9   201. Defendants are liable to Plaintiffs and the Class for damages in
10  amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

11  202. Pursuant to Okla. Stat. tit. 78 § 51, Plaintiffs will serve the Oklahoma
12  Attorney General with a copy of this complaint as Plaintiffs seek injunctive relief.

13  **EIGHTH CLAIM FOR RELIEF**

14  VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT

15  (Col. Rev. Stat. § 6-1-101. et seq.)

16  **Asserted on Behalf of the Colorado Subclass**

17  203. Plaintiffs and the Class incorporate by reference paragraphs 1-141 as
18  though fully set forth at length herein.

19  204. Defendants are "persons" under § 6-1-102(6) of the Colorado
20  Consumer Protection Act ("Colorado CPA"), Col. Rev. Stat. § 6-1-101 et seq.

21  205. Plaintiffs are "consumers" for purposes of § 6-1-113(1)(a) of the
22  Colorado CPA who purchased or leased one or more Subject Vehicles.

23  206. In the course of their business, Defendants participated in deceptive
24  trade practices that violated the Colorado CPA, as described above and below.
25  Defendants each are directly liable for these violations of law.

26  207. As alleged above, Defendants made numerous material statements
27  about the safety and reliability of the Subject Vehicles that were either false or

28

misleading.   Each of these statements contributed to the deceptive context of Defendants' unlawful advertising and representations as a whole.

208.   Defendants committed fraudulent business acts as a result of their misrepresentations and omissions regarding the safety and reliability of the Subject Vehicles.   Touting the vehicles' safety and failing to disclose the dangers inherent in the ignition switch, as set forth in this Complaint, were likely to deceive a reasonable consumer as to the safety of the vehicles.   Such safety information would be material to a reasonable consumer deciding whether to purchase or lease the Subject Vehicles.

209.   Defendants engaged in deceptive trade practices prohibited by the Colorado CPA, including (1) knowingly making a false representation as to the characteristics, uses, and benefits of the Subject Vehicles that had the capacity or tendency to deceive Plaintiffs; (2) representing that the Subject Vehicles are of a particular standard, quality, and grade even though Defendants knew or should have known they are not; (3) advertising the Subject Vehicles with the intent not to sell them as advertised; and (4) failing to disclose material information concerning the Subject Vehicles that was known to Defendants at the time of advertisement or sale with the intent to induce Plaintiffs to purchase or lease the Subject Vehicles.

210.   Defendants knew that the ignition switch in the Subject Vehicles was defectively designed or manufactured, would slip out of the "on" position, and was not suitable for its intended use.   Defendants nevertheless failed to warn Plaintiffs about these inherent dangers despite having a duty to do so.

211.   Defendants' practices significantly the public as actual consumers of the Subject Vehicles, which pose an unreasonable risk of death or serious bodily injury to Plaintiffs, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of the ignition switch slipping out of the "on" position during operation, suddenly and unexpectedly cutting power to the airbags, the power steering and the breaking systems.   In many instances, drivers

41

1   have been unable to control their vehicles after the power and electrical systems

2   shut down and have been involved in high speed crashes where airbags did not

3   deploy, resulting in severe injuries and deaths.

4       212.   Whether an ignition switch was designed and manufactured with

5   appropriate safeguards is a material safety concern that a reasonable consumer

6   would consider important in selecting a vehicle to purchase or lease.   When

7   Plaintiffs bought a Subject Vehicle for personal, family, or household purposes,

8   they reasonably expected the vehicle would not slip out of the "on" position during

9   operation causing loss of power to the airbags, power steering and breaking

10  systems.

11      213.   Defendants' deceptive practices were likely to and did in fact deceive

12  reasonable consumers, including Plaintiffs, about the true safety and reliability of

13  the Subject Vehicles.

14      214.   Plaintiffs suffered injury-in-fact to their legally protected property

15  interests as a result of Defendants' violations of the Colorado CPA detailed above.

16  Plaintiffs currently own or lease, or within the class period have owned or leased,

17  Subject Vehicles that are defective and inherently unsafe.   The ignition switch

18  defendants have caused the value of the Subject Vehicles to plummet.

19      215.   Pursuant to § 6-1-113(2) of the Colorado CPA, Plaintiffs seek

20  monetary relief against Defendants measured as the greater of (a) the amount of

21  actual damages sustained, (b) statutory damages in the amount of $500 for each

22  Plaintiff, or (c) three times the amount of actual damages if Plaintiffs establish that

23  Defendants  engaged in bad faith conduct.

24

25

26

27

28

3136095v1/014242

**NINTH CLAIM FOR RELIEF**

VIOLATION OF FLORIDA'S UNFAIR & DECEPTIVE

TRADE PRACTICES ACT

(Fla. Stat. § 501.201, *et seq.*)

**Asserted on Behalf of the Florida Subclass**

216.   Plaintiffs and the Class incorporate by reference paragraphs 1-141 as though fully set forth at length herein.

217.   The conduct of Defendants as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to Defendants' manufacture and sale of vehicles with a switch ignition defect, which Defendants failed to adequately investigate, disclose and remedy, and its misrepresentations and omissions regarding the safety and reliability of its vehicles.

218.   Defendants' actions as set forth above occurred in the conduct of trade or commerce.

219.   Defendants' actions impact the public interest because Plaintiffs were injured in exactly the same way as millions of others purchasing and/or leasing the Company's vehicles as a result of Defendants' generalized course of deception.  All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business.

220.   Plaintiffs and the Class were injured as a result of Defendants' conduct.  Plaintiffs overpaid for their Subject Vehicles and did not receive the benefit of their bargain, and their vehicles have suffered a diminution in value.

221.   Defendants' conduct proximately caused the injuries to Plaintiffs and the Class.

222.   Defendants are liable to Plaintiffs and the Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

223.   Pursuant to Fla. Stat. § 501.201, Plaintiffs will serve the Florida Attorney General with a copy of this complaint as Plaintiffs seek injunctive relief.

43

1    224.   Plaintiffs reallege and incorporate by reference all paragraphs as

2    though fully set forth herein.

3    **TENTH CLAIM FOR RELIEF**

4    VIOLATIONS OF THE SOUTH CAROLINA UNFAIR

5    TRADE PRACTICES ACT

6    (S.C. Code Ann. § 39-5-10, et seq.)

7    **Asserted on Behalf of the South Carolina Subclass**

8    225.   Plaintiffs and the Class incorporate by reference paragraphs 1-141 as

9    though fully set forth at length herein.

10    226.   Defendants are "persons" under S.C. Code Ann. § 39-5-10.

11    227.   Defendants participated in unfair or deceptive acts or practices that

12    violated the South Carolina Unfair Trade Practices Act (the "Act"), S.C. Code Ann.

13    § 39-5-10, et seq., as described above and below.  Defendants each are directly

14    liable for these violations of law.

15    228.   By failing to disclose and actively concealing the dangerous risk of the

16    ignition switch defect and potential for the ignition to slip out of the "on" position

17    in the Subject Vehicles, Defendants engaged in unfair or deceptive practices

18    prohibited by the Act, S.C. Code Ann. § 39-5-10, et seq., including (1) representing

19    that Subject Vehicles have characteristics, uses, benefits, and qualities which they

20    do not have, (2) representing that Subject Vehicles are of a particular standard,

21    quality, and grade when they are not, (3) advertising Subject Vehicles with the

22    intent not to sell them as advertised, (4) representing that a transaction involving

23    Subject Vehicles confers or involves rights, remedies, and obligations which it does

24    not, and (5) representing that the subject of a transaction involving Subject

25    Vehicles has been supplied in accordance with a previous representation when it

26    has not.

27    229.   As alleged above, Defendants made numerous material statements

28    about the safety and reliability of Subject Vehicles that were either false or

44

misleading.  Each of these statements contributed to the deceptive context of the unlawful advertising and representations as a whole.

230.  Defendants knew that the ignition switch in Subject Vehicles was defectively designed or manufactured, would fail without warning, and was not suitable for its intended use of ensuring the ignition remained in the "on" position. Defendants nevertheless failed to warn Plaintiffs about these inherent dangers despite having a duty to do so.

231.  Defendants each owed Plaintiffs a duty to disclose the defective nature of Subject Vehicles, including the likelihood of the ignition switch slipping out of the "on" position during operation, suddenly and unexpectedly cutting power to the airbags, the power steering and the breaking systems.  In many instances, drivers have been unable to control their vehicles after the power and electrical systems shut down and have been involved in high speed crashes where airbags did not deploy, resulting in severe injuries and deaths.

232.  Defendants possessed exclusive knowledge of the defects rendering the Subject Vehicles inherently more dangerous and unreliable than similar vehicles and intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from Plaintiffs; and/or made incomplete representations about the safety and reliability of Subject Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

233.  The Subject Vehicles posed an unreasonable risk of death or serious bodily injury to Plaintiffs, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to slipping out of the "on" position during operation, suddenly and unexpectedly cutting power to the airbags, the power steering and the breaking systems.

3136095v1/014242

234.   Whether an ignition switch was designed and manufactured with appropriate safeguards is a material safety concern that a reasonable consumer would consider important in selecting a vehicle to purchase or lease.

235.   When Plaintiffs bought the Subject Vehicle for personal, family, or household purposes, they reasonably expected the Subject Vehicle's ignition switch would remain in the "on" position when in operation.

236.   Defendants' unfair or deceptive trade practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of the Subject Vehicles.

237.   As a result of its violations of the Act detailed above, Defendants caused actual damage to Plaintiffs and, if not stopped, will continue to harm Plaintiffs.  Plaintiffs currently own or lease, or within the class period have owned or leased, Subject Vehicles that are defective and inherently unsafe.  These defects and the resulting unintended acceleration incidents have caused the value of Subject Vehicles to plummet.

238.   Plaintiffs risk irreparable injury as a result of Defendants' acts and omissions in violation of the Act, and these violations present a continuing risk to Plaintiffs as well as to the general public.

239.   Pursuant to S.C. Code Ann. § 39-5-140, Plaintiffs seek monetary relief against Defendants' to recover for their sustained losses.

240.   Plaintiffs further allege that Defendants' malicious and deliberate conduct warrants an assessment of punitive damages because Defendants each carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs to cruel and unjust hardship as a result.

241.   Plaintiffs further seek an order enjoining Defendants' unfair or deceptive acts or practices, restitution, punitive damages, costs of Court, attorney's fees, and any other just and proper relief available under the Act.

3136095v1/014242

1 IX.    **PRAYER FOR RELIEF**

2        WHEREFORE, Plaintiffs, individually and on behalf all others similarly

3 situated, respectfully request that this Court enter a judgment against GM and in

4 favor of Plaintiffs and the Class, and grant the following relief:

5        A.    Determine that this action may be maintained as a Class

6              action and certify it as such under Rule 23(b)(3), or alternatively

7              certify all issues and claims that are appropriately certified; and

8              designate and appoint Plaintiffs as Class and Subclass Representatives

9              and Plaintiffs' chosen counsel as Class Counsel;

10       B.    Declare, adjudge and decree the conduct of Defendants as

11             alleged herein to be unlawful, unfair and/or deceptive, and enjoin any

12             such future conduct;

13       C.    Award Plaintiffs and Class members actual,

14             compensatory damages, or, in the alternative, statutory damages, as

15             proven at trial;

16       D.    Alternatively, if elected by Plaintiffs and the Subclasses,

17             require Defendants to repair the defective ignition switches or provide

18             a comparable vehicle that does not have ignition switch defects;

19       E.    Award Plaintiffs restitution of all monies paid to

20             Defendants;

21       F.    Enjoin Defendants from further deceptive distribution,

22             sales, and lease practices with respect to the Subject Vehicles, and

23             directing Defendants to permanently, expeditiously, and completely

24             repair the Subject Vehicles to eliminate the ignition switch defect;

25       G.    Award Plaintiffs and the Class members exemplary

26             damages in such amount as proven;

27

28

47

1      H.      Award Plaintiffs and the Class members their reasonable

2   attorneys' fees, costs, and pre-judgment and post-judgment interest;

3   and

4      I.      Award Plaintiffs and the Class members such other

5   further and different relief as the case may require or as determined to

6   be just, equitable, and proper by this Court.

7

8   Dated:  April 23, 2014                      MARC M. SELTZER
                                                STEVEN G. SKLAVER
9                                               KALPANA SRINIVASAN
                                                SUSMAN GODFREY L.L.P.
10
                                                LESTER L. LEVY
11                                              WOLF POPPER LLP

12                                              By:  /s/ Marc M. Seltzer

13                                                  Marc M. Seltzer
                                                    Attorneys for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3136095v1/014242

1

**JURY TRIAL DEMAND**

2

Plaintiffs request a trial by jury on the legal claims, as set forth herein.

3

4

Dated:  April 23, 2014

MARC M. SELTZER
STEVEN G. SKLAVER
KALPANA SRINIVASAN
SUSMAN GODFREY L.L.P.

5

6

7

LESTER L. LEVY
WOLF POPPER LLP

8

By:  */s/ Marc M. Seltzer*

9

Marc M. Seltzer
Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

49